285 F.2d 911
 127 U.S.P.Q. 394
 ALUMINUM COMPANY OF AMERICA, Electro Circuits, Inc., and
Curtiss-Wright Corporation, Defendants-Appellants,
v.
SPERRY PRODUCTS, INC., Floyd A. Firestone and United
Aircraft Corporation, Plaintiffs-Appellees.
 No. 13890.
 United States Court of Appeals Sixth Circuit.
 Nov. 22, 1960.
 
 Carlton Hill, Chicago, Ill., and Stoddard B. Colby, Breed, Abbott & Morgan, New York City, for appellants.
 Thomas F. Doran, Meyer, Baldwin, Doran & Young, Cleveland, Ohio, and Carlton Hill and Van Metre Lund of Hill, Sherman, Meroni, Gross & Simpson, Chicago, Ill., and William L. Hanaway, Stoddard B. Colby, Egon R. Gerard, Breed, Abbott & Morgan, New York City, on the brief for Aluminum Co. of America and Curtiss-Wright Corp.
 James H. Tilberry, Williams, Tilberry & Golrick, Cleveland, Ohio, on the brief for Electro Circuits, Inc.
 J. Philip Anderegg and R. Morton Adams, Pennie, Edmonds, Morton, Barrows & Taylor, New York City, for appellee.
 Albert R. Teare, Teare, Kramer, Sturges & Fetzer, * Cleveland, Ohio, on the brief for Floyd A. Firestone.
 * Although this firm appears on the briefs for Dr. Floyd A. Firestone, they later withdrew as his counsel and Dr. Firestone represented himself thereafter.
 Ely, Pearne & Gordon, Cleveland, Ohio, and R. Morton Adams, J. Philip Anderegg, John T. Farley, Pennie, Edmonds, Morton, Barrows & Taylor, New York City, on the brief for Sperry Products.
 Before McALLISTER, Chief Judge, and MILLER and CECIL, Circuit Judges.
 CECIL, Circuit Judge.
 
 
 1
 This is an appeal from the District Court of the Eastern Division of the Northern District of Ohio. It involves infringement and validity of patents and a claim for damages and restraining orders asserted by counterclaim, for alleged misuse of patents through acts, contracts, combinations, conspiracies and monopolies all as set forth in the pleadings. The questions presented will be taken up and discussed seriatim.
 
 
 2
 There are four patents in suit: Nos. 2,280,226, 2,398,701, 2,467,301 and 2,592,134. For convenience, they are referred to as patent numbers 1, 2, 3 and 4, respectively. The dates of the applications for and the issuance of these patents are as follows:
 
 
 3
 Application Issued
No. 1 May 27, 1940 April 21, 1942
No. 2 June 29, 1942 April 16, 1946
No. 3 July 23, 1945 April 12, 1949
No. 4 June 28, 1945 April 8, 1952
 
 
 4
 The plaintiffs and appellees are the following: Floyd A. Firestone, the inventor of all four patents and the owner of the legal title to No. 1; Sperry Products, Inc., a New York corporation, the exclusive licensee under patents Nos. 1 and 2, and the owner of patents 3 and 4; and United Aircraft Corporation, a Delaware corporation, and the owner of patent No. 2. This latter party was brought into the action involuntarily.
 
 
 5
 Aluminum Company of America, a Pennsylvania corporation, hereinafter called 'Alcoa' is one of the defendants. It has a place of business in Cleveland, Chio, where it used the accused device known as the 'Immerscope.' Electro Circuits, Inc., a California corporation, is another defendant and is the manufacturer of the Immerscope. Having no place of business in the jurisdiction of the court, it became a party by voluntarily filing an answer and counterclaim. Curtiss-Wright Corporation, a Delaware corporation, became a defendant on its own motion for intervention under order of the court dated February 10, 1959. Subsequent to October 17, 1955, it had manufactured certain Immerscopes under license from Electro Circuits. It is financing this litigation due to the inability of Electro Circuits to do so. All of these defendants are appellants on this appeal.
 
 
 6
 The parties will be referred to as plaintiffs and defendants, as they were in the trial court.
 
 
 7
 We will take up first the question of the validity of patent No. 1. (pz 1, 849a)
 
 
 8
 The claimed invention involves the principles of electronics and consists of the following elements or component parts: A device consisting of pulse oscillator, high frequency oscillator and modulator, to generate voltage trains, each containing one or more electric oscillations at supersonic frequency; a piezoelectric crystal to which the electric oscillations are applied and which crystal is acoustically coupled to the workpiece to be inspected via a medium (a film of oil or wax) having good conductive properties for ultrasonic vibrations; an amplifier, electrically connected to the crystal and capable of amplifying the weak electric oscillations produced in the crystal, by echo waves reflected from discontinuities within the workpiece; a linear sweep circuit synchronized with the generation of the voltage trains applied to the crystal and a cathode ray tube whose beam is deflected by the linear sweep.
 
 
 9
 These components are all defined in the specifications of the patent.
 
 
 10
 The function of this apparatus as disclosed by the patent is for the inspection, exploration, and measurement of a solid part by means of supersonic vibration waves.
 
 
 11
 The operation of the apparatus consisting of these components may be explained in non-technical language as follows: An electric current is introduced into the pulse oscillator which causes it to emit rhythmic pulsations of current. Simultaneously an electric current is transmitted to a high frequency oscillator which is converted into a continuous high frequency current.
 
 
 12
 The output of these two components is conducted to the modulator which serves as an electronic valve. The rhythmic pulsations from the pulse oscillator open the valve for the duration of each pulse. While open, the high frequency current passes through to the sending crystal. From the modulator then comes a rhythmic series of high frequency pulses, referred to as wave trains, which are transmitted to the sending crystal, causing it to produce mechanical vibrations at the same frequency as the current sent to it.
 
 
 13
 The high frequency mechanical vibrations or sound waves from the vibrating crystal are transmitted through a medium of oil or wax on the crystal into the solid part or workpiece being inspected.
 
 
 14
 When the sound waves strike a flaw or the end of the workpiece, referred to as a discontinuity, they are reflected as an echo back through the workpiece to the point at or near which they entered. This echo is picked up by the receiving crystal, which may be the same one as the sending crystal or a different one, and the vibrations from the echo cause the receiving crystal to generate a small electric current. The current flowing from the receiving crystal is then increased in strength by an amplifier and conducted to a catholde ray oscilloscope, which is synchronized with the pulse of the oscillator, through a linear-sweep circuit.
 
 
 15
 When an electrical wave train is sent to the sending crystal, the linear-sweep circuit starts a spot of light moving horizontally across the fluorescent screen of the cathode ray tube at a constant speed.
 
 
 16
 The initial sound wave train deflects the spot. This deflection is referred to as a 'pip.' The spot then continues along its original path at the same speed, until the amplified current from the receiving crystal again deflects it, indicating that an echo has returned from a discontinuity in the workpiece. If the discontinuity is a flaw, the pip will occur closer to the original pip on the oscilloscope screen than that caused by a reflection from the end of the workpiece. The distance between the deflections created by the original pulse and the echo indicate the distance the sound waves have traveled, because this distance is correlated to the time it takes the sound waves to go out from the sending crystal and be reflected back to the receiving crystal.
 
 
 17
 The same process occurs when the discontinuity is the end of the workpiece, but this deflection will be farther from the original pip due to the increased time of travel.
 
 
 18
 Thus a graphic illustration of the initial sound waves, those reflected from the opposite end of the workpiece and those reflected from any intervening flaws, is made to appear on the oscilloscope screen. The whole process takes place with great rapidity, perhaps 100 times per second, and because of persistence of vision, the light spot on the oscilloscope screen appears as a stationary, continuous line.
 
 
 19
 Two basic questions challenging the validity of patent No. 1, which were argued by counsel for the defendants, in the trial court and determined by the trial judge, are here presented for review. These questions are 1, Floyd A. Firestone, the inventor, made a misrepresentation to the patent office in securing the allowance of the patent and 2, the claims in suit 2, 3, 4, 10 and 11 are lacking in invention over prior art and were anticipated by such prior art.
 
 
 20
 The defendants now raise, for the first time, questions concerning the sufficiency with which the structure or combination is defined in the claims in suit. This Court is not bound to consider such questions. 'It is the usual rule that we will not give consideration to issues not raised below.' Doll v. Glenn, 6 Cir., 231 F.2d 186, 190; Cold Metal Process Co. et al. v. McLouth Steel Corporation, 6 Cir., 170 F.2d 369, 380; Helvering v. Wood, 309 U.S. 344, 349, 60 S.Ct. 551, 84 L.Ed. 796.
 
 
 21
 In Hormel v. Helvering, 312 U.S. 552, 558, 61 S.Ct. 719, 722, 85 L.Ed. 1037, the court said: 'These decisions and others like them, while recognizing the desirability and existence of a general practice under which appellate courts confine themselves to the issues raised below, nevertheless do not lose sight of the fact that such appellate practice should not be applied where the obvious result would be a plain miscarriage of justice.'
 
 
 22
 No such result would obtain here. The validity of patent No. 1 can be determined by a consideration of the two basic questions mentioned above.
 
 
 23
 Further, we are of the opinion that the claims in suit, so far as sufficiency of statement is concerned, meet the requirements of the statute. Section 112 of the patent act, which became effective January 1, 1953, provides, in part, 'An element in a claim for combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.'
 
 
 24
 It was further provided that the Act should apply to unexpired patents granted before the effective date of the Act.
 
 
 25
 This statute is in a sense a codification of an existing practice, but, as stated in the commentary on the Act, 'It is unquestionable that some measure of greater liberality in the use of functional expressions in combination claims is authorized than had been permitted by some court decisions, and that decisions such as that in Halliburton Oil Well Cementing Co. v. Walker, 67 S.Ct. 6, 329 U.S. 1, 91 L.Ed. 3 (1946) are modified or rendered obsolete, but the exact limits of the enlargement remain to be determined.' p. 25 Title 35 U.S.C.A., Patents, Sections 1 to 110.
 
 
 26
 We consider that the elements of the combination constituting the claimed invention are sufficiently defined and described in the specifications to support the claims in suit as stated.
 
 
 27
 One of the claims of invalidity is based on a charge that Mr. Firestone, the patentee, made misrepresentations of fact to the patent office, which induced the allowance of the patent. Mr. Firestone stated in one of his responses to the patent office, after a rejection, that his device would measure distances as small as 1/16 inch. The defendants say that he purposely withheld the fact that he had been unable to measure a distance of 10 inches three months before the application was filed.
 
 
 28
 This defense was not made in the answers filed by the defendants. It was asserted after the trial judge, while studying the case, called attention of the parties by letter to certain testimony which was not discussed in their briefs.
 
 
 29
 The trial judge ruled against the defendants on this issue. It is claimed by the defendants that in arriving at this conclusion the judge relied on an entry in a notebook of Mr. Firestone, which was not properly admissible. (px 54, 883a) The page in question of the notebook had been admitted for another entry on another point.
 
 
 30
 This was a notebook which Mr. Firestone began using about August 1940. It was in his handwriting and contained entries of his work dated currently with the time of the entry. It was introduced for the entry dated January 10, 1941. This page also carried an entry dated November 2, 1940. It was this entry to which the trial judge made reference and which is objected to by the defense. The Court held that there was sufficient proof to allow its admission for the 1941 entry. If it were properly admitted for the one entry we see no reason why it cannot be considered for another similar entry of a different date. We think this exhibit was properly introduced under Section 1732, Title 28 U.S.C.
 
 
 31
 In National Latex Products Company v. Sun Rubber Co., 6 Cir., 274 F.2d 224, certiorari denied 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022, reports of the inventor were in evidence but there is no discussion of their admissibility. In Erie R. Co. v. Lade, 6 Cir., 209 F.2d 948, 951, the Court said: 'Rule 43(a), Federal Rules of Civil Procedure, 28 U.S.C., gives the court much latitude in determining admissibility of evidence and doubts must be resolved in favor of admissibility.'
 
 
 32
 After reviewing all of the evidence on the subject of misrepresentation, we conclude that the facts as found by the trial judge are not clearly erroneous. The facts amply support his conclusions: 'I hold, therefore, that the representation of Dr. Firestone as to the 1/16 inch measurement was not fraudulently made and that under the circumstances such representation was not a material departure from the true measuring capability of patent No. 1.' D.C., 171 F.Supp. 901, 908. And at page 910, 171 F.Supp.: 'A fair analysis of the record leads to the conclusion that defendants have failed to sustain their claims of misrepresentation by that degree of clear and satisfactory proof required by law. I find that the presumption of the validity of patent No. 2280226 has not been impaired by misrepresentations to the patent office.'
 
 
 33
 The statute gives a patent a presumption of validity. (Section 282 of Title 35 U.S.C.) This presumption is weakened if there is applicable prior art not considered by the patent office. France Mfg. Co. v. Jefferson Electric Co., 6 Cir., 106 F.2d 605; Wolverine Fabricating & Mfg. Co., Inc. v. Detroit Gasket & Mfg. Co., 6 Cir., 148 F.2d 399; Modern Products Supply Co. v. Drachenberg, 6 Cir., 152 F.2d 203; Cold Metal Process Company v. Republic Steel Corp., 6 Cir., 233 F.2d 828; Gibson-Stewart Company, Inc. v. Wm. Bros Boiler & Manufacturing Company, 6 Cir., 264 F.2d 776; Murray Company of Texas, Inc. v. Continental Gin Company, 5 Cir., 264 F.2d 65.
 
 
 34
 Patent No. 1 now before us, if valid, must rest on the principle that it is a combination of old elements which accomplish a new and useful result. It is elementary that the elements requisite to the validity of a patent are novelty, utility and invention.
 
 
 35
 Judge McAllister, speaking for the Court in Allied Wheel Products v. Rude, 6 Cir., 206 F.2d 752, 760, said: 'Anticipation belongs in the field of novelty. To anticipate an invention is to negative novelty; but even though a patent is not anticipated, and is concededly novel, it may lack invention. In order to anticipate an invention, it is necessary that all of the elements of the invention or their equivalents be found in one single description or structure, where they do substantially the same work in substantially the same way.'
 
 
 36
 In Ohmer Fare Register Co. v. Ohmer, 6 Cir., 238 F. 182, 186, Judge Knappen, speaking for the Court, said: 'We are cited to no reference in the prior art fully anticipating the patent in suit. But we are considering the scope of invention, not anticipation; and in such inquiry the question is one of fact, taking into account the entire prior art, whether the advance made in the given case amounts to invention or only mechanical skill. * * * All elements of the prior art have a bearing upon the question of invention; it being unnecessary to a finding of lack of invention that every element be found in one embodiment.'
 
 
 37
 'A reference, in order to be effective to disprove the novelty of an alleged invention, must relate to the same art as the questioned invention or to an analogous or closely related art.' Allied Wheel Products v. Rude, 6 Cir., 206 F.2d 752, 755. 'With regard to analogous art, it is the rule that, though an inventor is conclusively presumed to know the prior art in his own and clearly allied lines of endeavor, he is not bound by what has been done in remote or non-analogous arts.' Allied Wheel Products v. Rude, supra, 755. See also: Ottinger v. Ferro Stamping & Mfg. Co., 6 Cir., 59 F.2d 640; Alemite Mfg. Corp. v. Rogers Products Co., Inc., 3 Cir., 42 F.2d 648.
 
 
 38
 In A. J. Deer Co., Inc. v. United States Slicing Machine Co., 7 Cir., 21 F.2d 812, 813, the court said: 'We are of opinion that whether arts or uses are analogous depends upon the similarity of their elements and purposes. If the elements and purposes in one art are related and similar to those in another art, and because and by reason of that relation and similarity make an appeal to the mind of a person having mechanical skill and knowledge of the purposes of the other art, then we are of the opinion that such arts must be said to be analogous, and, if the converse is true, they are nonanalogous arts.' See also Allied Wheel Products v. Rude, supra; Copeman Laboratories Co. v. General Plastics Corp., 7 Cir., 149 F.2d 962; B & M Corporation v. Koolvent Aluminum Awning Corporation of Indiana, 7 Cir., 257 F.2d 264. Another test is stated in General Metals Powder Co. v. S. K. Wellman Co., 6 Cir., 157 F.2d 505, 510: 'A reasonable test is, whether the art from which the citations against the patent were drawn, was so remote that students of the questioned art would not naturally have looked there for help.'
 
 
 39
 Findings of fact of the trial court in a patent case cannot be set aside unless clearly erroneous. Rule 52, F.R.Civ.P., 28 U.S.C.A.; General Metals Powder Co. v. S. K. Wellman Co., supra; Gibson-Stewart Company, Inc. v. Wm. Bros Boiler & Manufacturing Company, supra; Cold Metal Process Company v. Republic Steel Corp., supra.
 
 
 40
 With these principles in mind we now turn to the references to see if from the combined disclosures of all of them a person skilled in the art might readily have designed the device alleged by the plaintiffs to constitute invention.
 
 
 41
 Mr. Fishleigh called as an expert by the defendants made a comparison of the non-cited references with the patent in suit. We are unable to find from his testimony or any testimony in the record that one skilled in analogous art could have designed the device which is the subject of patent No. 1 from the combined disclosures of all the prior art to which reference is made. We find, therefore, that the patent is not invalid for lack of invention.
 
 
 42
 This view is strengthened by a letter (px 61, 899a) from Dr. W. D. Coolidge to Dr. Firestone, dated February 10, 1943. Dr. Coolidge was consultant in x-ray matters for General Electric Company and formerly a Vice-president and Director of Research of that company. He said, in part: 'Stimulated by a Russian publication in this field several years ago, we had a try at this method but without getting results of practical value.'
 
 
 43
 The invention of this patent is not anticipated by any of the prior art references, either those cited in the file wrapper or those not cited. Not one of these references contains all of the elements of the invention or its equivalents. Allied Wheel Products v. Rude, supra.
 
 
 44
 The trial judge found patent No. 1 valid (D.C., 171 F.Supp. 901, 910-914) and our findings support that conclusion. His findings are certainly not clearly erroneous.
 
 
 45
 The defendants challenge the validity of claims numbered 7, 16, 19, 20, 25, 26, 29 and 32 of patent No. 2. Claim No. 7 was held invalid by the trial judge and is the subject of appeal in case number 13891.
 
 
 46
 Claims numbered 16, 25 and 29 involve the use of a heterodyne amplifier. It is charged that this amplifier is old and lacks invention over patent No. 1 and that it is anticipated by prior patents, Harrison No. 2,433,361 (dx K-12, 1069a) and Wiseman No. 2,491,540 (dx K-15, 1105a).
 
 
 47
 It is claimed that crystal damping which is described in claims 19 and 32 is old in the art and anticipated by the Sokolov 1935 Publication (dx K-36, 1199a), Round patent No. 1,732,029 (dx K-5, 1031a), Sawyer patent No. 2,105,010 (dx E-14, 969a) and British patent No. 473,636 (dx E-29, 987a).
 
 
 48
 Claims 20 and 26 are directed to the operation of the heterodyne amplifier and the damped crystal in combination. It is claimed that there is no new coaction between the crystal and the amplifier, that both elements are old and that the claims are anticipated by prior art as shown in exhibits JJ and KK.
 
 
 49
 It is known that crystal damping was in use before Dr. Firestone's adaptation of it in patent No. 2 (Fishleigh 325a) and he concedes that the heterodyne amplifier was old in the art before he used it in this patent. The gist of Dr. Firestone's alleged invention in patent No. 2, as evidenced by the claims in suit, can be simply stated in his own language:
 
 
 50
 'I might say that heterodyne amplifiers were used before my invention both having frequencies lower that the signal frequency and those having frequencies higher than the signal frequency, but no one recognized this property of the heterodyne amplifier that it would recover its sensitivity more quickly after receiving a shock. So I have taught that if one combines a heterodyne amplifier with a damped crystal, damped in the particular manner that I have shown, one can find flaws closer to the surface than by omitting such elements.' (104a), and
 
 
 51
 At pages 564 and 547a: 'I concede right off that there have been used before my invention heterodyne amplifiers having intermediate frequencies higher than the signal frequency. But they were always used for announced purposes which were different than my purpose, and none of them taught what I discovered, that a heterodyne amplifier with such elevated intermediate frequency will recover its sensitivity after the initial shock more rapidly than will a straight amplifer, and Wiseman is one example of such an amplifier. And if there has not been such teaching in the past literature, one does not know enough to choose such an amplifier in the design of his apparatus. I was the first to announce that such a heterodyne amplifier will recover its sensitivity more rapidly than a straight amplifier.'
 
 
 52
 'The Claim 26 is based on Claim 25 and combines that particular kind of a heterodyne amplifier along with means for damping the free vibrations of said crystal. So you can fail to find a flaw that is close to the surface either because the amplifier you used did not recover fast enough or because the crystal was not adequately damp, and the combination of those two enables you to find flaws which would otherwise be undetectable.'
 
 
 53
 The trial judge found that patent No. 2 related to improvements of patent No. 1 in the following respects: 1. Damping of the transducer (crystal) (claims 19 and 32); 2. Amplification by use of a heterodyne amplifier (claims 16, 25 and 29); and, 3. 'The use of improved means for the application of a train of voltage oscillations to the sending crystal.' (Claim 7 which was held invalid.)
 
 
 54
 Patent No. 2 was in the Patent Office for nearly four years (June 1942-April 1946) before it was allowed. The claims in suit, except No. 32, were rejected one or two times, primarily because the combination had been exhausted by the first patent. Before the claims were finally allowed, Dr. Firestone made oral argument to the patent examiner. This argument is not a part of the file wrapper record and we, therefore, do not know the nature of it or what effect it had in overcoming the objections of the patent office.
 
 
 55
 The utility of patent No. 2 lies in the claim of Dr. Firestone that he had invented a means of detecting flaws in metal closer to the surface-- within one-half inch.
 
 
 56
 To substantiate his claim to patent No. 1, after it had been rejected by the patent office, Dr. Firestone wrote, on January 16, 1941, to that office: 'I teach how to determine the thickness of a piece of steel when it is even as thin as 1/16 inch and when the reflected wave train arrives 0.2 micro-seconds after the initial pulse.' (913a) It appears that this was a vital matter in allowing this patent.
 
 
 57
 On January 15, 1941, in a letter to Edwin D. Eaton, (px 53, 879-880a) he wrote: '* * * Our equipment has been speeded up to such a point that we can now measure the thickness of the parallel plate, which you sent us 1/16 in. thick in which case the successive reflections arrive back at the sending point 1/2 micro-seconds apart. * * * This improved operation and high speed has been made possible by two improvements: first, the damping of the quartz crystal by the addition of a heavy layer of wax to its back side, and second, the construction of a new amplifier having very short time constants in all parts of its circuit.'
 
 
 58
 In the early part of this opinion we sustained the trial court's finding that there was no misrepresentation by Dr. Firestone in claiming that he could measure the thickness of metal down to 1/16 of an inch.
 
 
 59
 The trial judge discussed at great length prior patents and whether they anticipated the alleged invention of patent No. 2. The more important question is whether or not there was invention over patent No. 1. Counsel for plaintiffs claim that a new and unobvious result was achieved by the patent. Was the result unobvious or was it mere refinement such as any one skilled in the art might develop from the disclosures of the first patent?
 
 
 60
 In Riddell, Inc. v. P. Goldsmith Sons Co., 6 Cir., 92 F.2d 353, 356, the Court said: 'The most that can be said for the claim is that, being skilled in an art continually undergoing refinement, he probably produced a better football shoe, but the improvement, if any, was in degree only and was not invention. * * * We think the claim represents nothing more than the exercise of mechanical skill such as might have been expected and falls within the second rule announced in Hug v. Lakewood Eng. Co., 7 F. (2d) 98, 99, (C.C.A. 6).'
 
 
 61
 The rule referred to is: 'In the other class he finds most of the elements already in combination, and adds one or two already well known, singly or as groups, as common expedients in similar situations, or he substitutes for one or two of those elements devices already familiar to mechanics for analogous use; here must be a very meritorious case of benefit to the art in order to justify a patent.'
 
 
 62
 In Dunbar v. Myers, 94 U.S. 187, 199, 24 L.Ed. 34, the Court citing Smith v. Nichols, 21 Wall. 112, 88 U.S. 112, 22 L.Ed. 566, said: 'Meritorious inventors are entitled to protection; but it is settled law that a mere carrying forward of an original patented conception, involving only change of form, proportions, or degree, or the substitution of equivalents, doing the same thing as the original invention by substantially the same means, is not such an invention as will sustain a patent, even though the changes of the kind may produce better results.'
 
 
 63
 'A new application of an old device may not be patented if the 'result claimed as new is the same in character as the original result' (Blake v. San Francisco, 113 U.S. 679, 683), even though the new result had not before been contemplated.' Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 41, 86 L.Ed. 58 and cases cited.
 
 
 64
 Here the claims in suit involve a heterodyne amplifier which is old, damping of the crystal which was previously known and a combination of the two which resulted in detecting flaws closer to the surface than could be done with patent No. 1. The parts performed the same function and operated in the same way as they did in the original patent. The difference in result was one of degree. It was only a refinement such as one skilled in the art could have achieved from the disclosures of the first patent. This is not invention.
 
 
 65
 The questions arise from Dr. Firestone's own testimony whether he even achieved any new result. He says the minimum dimension that could be measured by the first patent was 1/16 of an inch. In detection of flaws he said: 'Approximately a half an inch, or inch, perhaps.' (186a)
 
 
 66
 In the specifications of patent No. 2, page 3, first column, line 22, it is stated: 'With my device the first reflection from a flaw one-half of an inch away may be observed, and successive reflections obtained in a plate one-sixteenth of an inch thick.'
 
 
 67
 And on page 4, at line 11, second column, he says, 'unusually good results are obtained in detecting flaws in parts of the order of magnitude of an inch in linear dimension, or in detecting flaws which lie within one-half of an inch of the sending point and from which the reflected wave train is received four micro-seconds after the initial wave train is sent out.'
 
 
 68
 For the reasons herein stated, we find that claims 16, 19, 20, 25, 26, 29 and 32 are invalid for lack of invention over patent No. 1. Arriving at this conclusion it is not necessary to discuss anticipation by prior art.
 
 
 69
 There are three claims in patent No. 3 and the defendants challenge the validity of all of them on the ground that they are anticipated by prior art.
 
 
 70
 This is an improvement patent and the gist of it, as shown by the evidence and the specifications of the patent, is well stated by appellees in their brief, at p. 51, 'the interposition between the means for transmitting supersonic wave trains (the crystal) and the workpiece of means capable of conducting the wave trains and having a dimension in the direction of wave train travel such that the reflected wave trains are received after the transmission of the wave trains is completed. It is the interposition of delay means of these dimensions which secures the advantage of the patent, namely the ability to detect flaws immediately below the surface of the workpiece.'
 
 
 71
 The trial judge discussed the alleged applicable prior art devices and found that none of them anticipated the patent in suit. (D.C., 171 F.Supp. 901, 919.) Having in mind the rule of anticipation as we have heretofore stated it, we conclude that the trial judge was correct in his findings and that they are not clearly erroneous.
 
 
 72
 Here as in the case of patent No. 2 the pertinent question is one of invention over patent No. 1. In his opinion, the trial judge said: 'The title of patent, (Supersonic Inspection for flaws lying near the surface of a part,) indicates in large part its purposes.' All three of these patents have for their purpose, supersonic inspection of a workpiece to detect flaws through the use of wave trains. It is claimed by Dr. Firestone that No. 2 was capable of detecting flaws closer to the surface than was possible with No. 1 and that with No. 3 still better results in this respect were schieved.
 
 
 73
 The principal distinguishing feature between patents No. 3 and No. 1 is that a piece of metal of undisclosed size and shape, or a tank of undisclosed size containing a liquid of undisclosed content is placed between the crystal and the workpiece in patent No. 3. The same combination of elements as is used in patent No. 1 is used in this patent with the addition of the interposed member. It operates by the same fundamental principle. It produces a refinement of the same result. The question then arises as to whether or not this is invention. Would the adding of this element between the crystal and the workpiece be obvious to one ordinarily skilled in the art?
 
 
 74
 Looking backward it seems that this advance was a logical step and that it was so simple that it would have been obvious to any artisan. That was the patent examiner's first impression and he rejected the claims for that reason.
 
 
 75
 In an application for reconsideration, it was pointed out that seven instruments made in accordance with patent No. 1 were sold to large industrial companies; that they were sold subject to the limitation that testing cannot be performed closer than 1/2 inch to the surface of the object under test. Although these machines were operated by highly skilled research men, under the direction of skilled research directors, the problem had not been solved before Dr. Firestone's disclosure in patent No. 3. These men had long been aware of the problem and were eager for a solution, as detecting flaws closer to the surface was a matter of great importance.
 
 
 76
 Upon these representations the examiner allowed the three claims of the patent now in suit. There is some evidence by Mr. Fishleigh (pp. 390a-391a) that the advance was an obvious one to one skilled in the art. There is no evidence contradictory to the representations in the application for reconsideration. 'It is often difficult to determine whether a given improvement is a mere mechanical advance, or the result of the exercise of the creative faculty amounting to a meritorious invention. The fact that the invention seems simple after it is made does not determine the question; if this were the rule many of the most beneficial patents would be stricken down. It may be safely said that if those skilled in the mechanical arts are working in a given field and have failed after repeated efforts to discover a certain new and useful improvement, that he who first makes the discovery has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor.' Expanded Metal Co. v. Bradford, 214 U.s,. 366, 381, 29 S.Ct. 652, 655, 53 L.Ed. 1034. See also: Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 330, 65 S.Ct. 647, 89 L.Ed. 973; Loom Company v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177; Cold Metal Process Company v. Republic Steel Corp., 6 Cir., 233 F.2d 828, 837, certiorari denied, 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed.2d 86, rehearing denied, 352 U.S. 955, 77 S.Ct. 323, 1 L.Ed.2d 245; and G. H. Packwood Mfg. Co. v. St. Louis Janitor Supply Co., 8 Cir., 115 F.2d 958, 964.
 
 
 77
 We find that there is not sufficient evidence of lack of invention to overcome the presumption of validity. Accordingly, we conclude that all claims of patent No. 3 are valid.
 
 
 78
 Patent No. 4 is a method patent. The purpose of claim 2, which is in suit, is for the inspection of the interior of a solid part and the detection of flaws therein. This claim describes a method adapted to the use and operation of the device covered by patent No. 1 and serves the useful purpose of being able to inspect a larger area of the workpiece without moving it, and of detecting flaws not otherwise ascertainable. There is no change in the fundamental principle of detecting flaws, as taught by patent No. 1. It is particularly adaptable for the inspection of a piece that is attached to a piece of machinery or other object.
 
 
 79
 The method of operation is pretty well described by the language of the claim: 'The method of inspecting the interior of a solid part, which consists in transmitting a supersonic wave through a liquid which is in contact with the solid part, varying the angle of incidence of the wave for scanning a cross-sectional area of the solid part, and detecting waves emerging from the solid part into said liquid with an angle of emergence equal to the aforementioned angle of incidence.' Varying the angle of incidence is accomplished by a device which permits the crystal to be tilted or slanted.
 
 
 80
 The defendants charge that claim 2 is invalid because it is anticipated by Gotz, a prior art reference disclosed in a German publication 'Akustishe Zeitschrift' (dx K-42, 1229a), and because it lacks invention.
 
 
 81
 The trial judge made findings by which he distinguished between the disclosures of Gotz and claim 2 of the patent now before us. He found that there was no anticipation. We agree with his conclusions and find that they are not clearly erroneous.
 
 
 82
 We might say further that the Gotz reference discloses that the author was transmitting sound waves through his workpiece at an angle and measuring the intensity of the received sould, rather than measuring the time interval between the sending of a wave train and the reception of a wave train reflected from a flaw or discontinuity. There is a basic difference. 'A foreign patent is to be measured as anticipatory, not by what might have been made out of it, but by what is clearly and definitely expressed in it. An American patent is not anticipated by a prior foreign patent, unless the latter exhibits the invention in such full, clear, and exact terms as to enable any person skilled in the art to practice it without the necessity of making experiments.' Carson v. American Smelting & Refining Co., 9 Cir., 4 F.2d 463, 465, certiorari denied, 269 U.S. 555, 46 S.Ct. 18, 70 L.Ed. 409. See also: Borg-Warner Corp. v. Mall Tool Co., 7 Cir., 220 F.2d 803.
 
 
 83
 We find claim 2 of patent 4 is not anticipated by Gotz.
 
 
 84
 The patent office allowed the patent after first rejecting it because of lack of invention over patent No. 1. The method described by the claim in suit is novel and useful and we think is properly classed as invention. The trial judge so found and we cannot say that such finding is clearly erroneous. Neither can we find sufficient evidence of lack of invention to overcome the presumption of validity.
 
 
 85
 We find the claim in question to be valid.
 
 
 86
 We have been considering, under the first six questions of defendants' brief, the validity of the claims in suit of patents numbered 1, 2, 3 and 4. Questions eight and nine still further challenge the validity of patent No. 1.
 
 
 87
 It is charged that the trial judge was strongly influenced to find patent No. 1 valid by reason of a letter dated February 10, 1943 (px 61, 899a), of W. D. Coolidge, then Vice-president and Director of Research of General Electric Company, to Dr. Firestone. We have previously referred to that letter and quoted the second paragraph to which the objection was directed. The defendants claim that this letter is hearsay and not admissible.
 
 
 88
 Cr. Coolidge was Director of Research of General Electric at the time he wrote the letter and had two or three hundred men under him. He was eighty-three years old at the time his deposition was taken in 1957 and had been retired since 1944. He had no present recollection of the subject discussed in the letter but he identified it as having been written by him and was certain that it stated a fact as of the time it was written. The letter is simply a memorandum recording a situation as of fourteen years before. The case was being tried to the court and the trial judge has considerable discretion as to what evidence shall be admitted. The Federal Rules and practice favor admission of evidence rather than exclusion if the proffered evidence has any probative value at all. We think the letter was admissible for what it appeared to be and that the question was one of weight rather than admissibility.
 
 
 89
 We do not find that the trial judge attached undue weight to the letter. He did not find that it was determinative of the issue of validity of patent No. 1, nor do we. It was cumulative and after finding validity it added strength to the conclusion. The fact that others had not achieved a result or made a discovery is only a circumstance in determining invention.
 
 
 90
 The claim that the trial judge based his finding of validity of patent No. 1 on commercial sucess is without foundation. We do not find anything in the opinion that would indicate he made such a finding, nor have counsel for the defendants referred any such findings to us. Only in close cases where there is some doubt about invention will commercial success tip the scales in favor of validity. If invention is lacking in device no amount of commercial success will validate a patent. Jungersen v. Ostby & Barton Co.,335 U.S. 560, 567, 69 S.Ct. 269, 93 L.Ed. 235; Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162.
 
 
 91
 The trial judge did not find that invention was such a close question that it was necessarty to rely on commercial success to sustain validity.
 
 
 92
 The defendants charge that the trial judge refused to recognize the fundamental rule that a device does not infringe where it follows the prior art rather than the patent disclosures. It is obvious that there can be no infringement in this case unless the accused device, the Immerscope, follows the teachings of the claims in suit of patents numbered 1, 3 and 4.
 
 
 93
 The trial judge painstakingly compared all of the alleged prior art references with the claims in suit of the patents herein involved. He found there was no anticipation. We sustain him in his findings as to patents 1, 3 and 4. As already stated we find patent No. 2 invalid for lack of invention.
 
 
 94
 The pertinent question here is whether the Immerscope follows the teachings of plaintiffs' patents. If its source is not in any one or more of these patents, it matters not where else it may be.
 
 
 95
 An infringement said the court in Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 569, 18 S.Ct. 707, 723, 42 L.Ed. 1136, quoting from Burr v. Duryee, 1 Wall. 531, 573, 17 L.Ed. 660, 'is a copy of the thing described in the specification of the patentee, either without variation, or with such variations as are consistent with its being in substance the same thing. If the invention of the patentee be a machine, it will be infringed by a machine which incorporates in its structure and operation the substance of the invention; that is, by an arrangement of mechanism which performs the same service or produces the same effect in the same way, or substantially the same way. * * * That two machines produce the same effect will not justify the assertion that they are substantially the same, or that the devices used are therefore mere equivalents for those of the other.'
 
 
 96
 'Infringement of a combination patent occurs only through a combination comprising every one of its elements or a mechanical equivalent.' Guide v. Desperak, 2 Cir., 249 F.2d 145, 147. See also: Rowell v. Lindsay, 113 U.S. 97, 102, 5 S.Ct. 507, 28 L.Ed. 906; Imhaeuser v. Buerk, 101 U.S. 647, 25 L.Ed. 945.
 
 
 97
 'It is well established that improver cannot appropriate the basic patent of another, and that the improver without a license is an infringer, and may be sued as such.' Tempco Electric Motor Co. v. Apco Co., 275 U.S. 319, 328, 48 S.Ct. 170, 173, 72 L.Ed. 298. See also: Cochrane v. Deener, 94 U.S. 780, 787, 24 L.Ed. 139; Cantrell v. Wallick, 117 U.S. 689, 694, 6 S.Ct. 970, 29 L.Ed. 1017; Chesapeake & Ohio Ry. Co. v. Kaltenbach et al., 4 Cir., 95 F.2d 801, 804.
 
 
 98
 'If the infringing device performs the same function as the patented device, it is immaterial that it also performs some other function. It is still none the less an equivalent of the patented device, and an appropriation of the patented invention.' Comptograph Co. v. Mechanical Accountant Co., 1 Cir., 145 F. 331, 338. See also: Chesapeake & Ohio Ry. Co. v. Kaltenbach, supra, and cases there cited.
 
 
 99
 As said by the trial judge, an accused device cannot escape infringement by merely adding features, if it otherwise adopts the basic features of the patent. Holland Co. v. American Steel Foundries, 7 Cir., 190 F.2d 37, certiorari denied, 342 U.S. 859, 72 S.Ct. 86, 96 L.Ed. 647; Aluminum Co. of America v. Thompson, 6 Cir., 122 F.2d 796; Kelley-Koett v. McEuen, 6 Cir., 130 F.2d 488, certiorari denied, 318 U.S. 762, 63 S.Ct. 662, 87 L.Ed. 1134.
 
 
 100
 With these principles in mind, we proceed to analyze the Immerscope with reference to infringement of the Firestone patents.
 
 
 101
 The Immerscope consists of the following essential elements or component parts: A device consisting of a free running multivibrator, blocking oscillator and thyratron pulser, which serve to pulse the crystal; a piezoelectric quartz crystal to which the pulse is applied causing it to vibrate, and which is connected to the workpiece by immersing both in liquid, usually water, or putting a stream of water between them so that sound is conducted from crystal to workpiece; an amplifier-rectifier combination which serves to amplify small voltages and rectify individual oscillations received from the crystal, linear sweep circuit synchronized with the multivibrator of the pulsing apparatus consisting of a bootstrap sweep generator and horizontal amplifier, which causes a trace to sweep horizontally across the cathode ray tube at a constant speed, as each pulse is emitted; and cathode ray tube or oscilloscope.
 
 
 102
 In addition to the above essential elements the Immerscope has apparatus for delaying the synchronization to allow the operator to select what he views on the oscilloscope; an audio or visual flaw alarm, a sensitivity time control to amplify later returning weaker echoes; and a marking system that produces pips at regular time intervals on the oscilloscope screen adjacent to echo pips for a time measuring yardstick.
 
 
 103
 The Immerscope's crystal pulsing apparatus sends a pulse of electricity to the crystal and causes it to vibrate in the same manner as the wave train generator of patent No. 1. Although the component parts of the wave train generator and the pulsing apparatus have different names, their total effect is the same.
 
 
 104
 Both devices use a piezoelectric quartz crystal that is caused to vibrate when it receives a pulse of electricity. These crystals are substantially identical. The Immerscope uses one such crystal for both a sender and receiver while the device of patent No. 1 may use one or two.
 
 
 105
 Firestone uses a thin film of oil or wax between his crystal and workpiece to conduct sound waves from one to the other. The Immerscope uses a column of sound conducting liquid, usually water, between them, obtained by immersing both the crystal and workpiece in liquid or running a stream between them.
 
 
 106
 The Immerscope has an amplifier-rectifier combination which amplifies weak electrical currents received from the crystal and rectifies individual oscillations so that only their voltage envelope is shown on the oscilloscope screen. Firestone's patented device calls for an amplified and a rectifier to be used for the same purposes, although his rectifier is optional.
 
 
 107
 Both devices have a linear sweep circuit synchronized with the emission of pulses or wave trains that cause a trace to travel at a constant speed across the oscilloscope screen.
 
 
 108
 The Immerscope and the patented device utilize a cathode ray tube or an oscilloscope as an indicating device.
 
 
 109
 Defendants urge that the Immerscope can be distinguished from Firestone patent No. 1 by the type of testing done by each. It is claimed that the Firestone patent is limited to contact testing whereas the Immerscope is used in immersion testing and that difference is sufficient to avoid infringement. The District Judge discussed this distinction at length and found that at most the Immerscope was an improvement over the Firestone patent and that there was infringement. We are in accord with his findings and conclude that they are not clearly erroneous.
 
 
 110
 Upon a careful analysis of the elements and functioning of the Immerscope and Firestone patent No. 1, we conclude that the Immerscope operates in substantially the same way and uses substantially the same means as that which forms the substance of the Firestone invention.
 
 
 111
 Accordingly, we sustain the District Court's finding that claims numbered 2, 3, 4, 10 and 11 of patent No. 1 are infringed.
 
 
 112
 No. 2 patent is invalid for lack of invention over the disclosures of No. 1. Its alleged improvements over patent No. 1 were obvious to one skilled in the art. Therefore, No. 2 adds nothing to the disclosures of patent No. 1.
 
 
 113
 There seems to be little question that the Immerscope infringes all of the claims of patent No. 3. The defendants virtually admit this in their argument on the validity of the claims of patent No. 3 (Defendants' brief p. 40). We are in accord with the findings and conclusions of the trial judge on this question. The claims of patent No. 3 are infringed by the Immerscope.
 
 
 114
 The evidence supports the reasoning and conclusions of the trial judge on the question of infringement of claim 2 of patent No. 4. His findings are not clearly erroneous and for the reasons stated by him we conclude that the Immerscope infringes claim 2 of patent No. 4.
 
 
 115
 This case presents substantial questions on the validity of the patents in suit. There is very little question about the infringement of the accused device. Electro Circuits, Inc. sought a license from Sperry in order that it might manufacture its Wide Band Converter. This request for a license was refused but Sperry entered into a contract with Electro Circuits whereby it could use the Sperry patents in its Wide Band Converter under certain conditions or restrictions. These conditions or restrictions will be discussed later. Electro Circuits continued under the belief that it was necessary to have consent to use the disclosures of the Firestone patents until it was advised by counsel that they were invalid. Upon receiving this advice it began making the Immerscope, the accused device without restriction.
 
 
 116
 By some process of reasoning, the defendants now argue that the overall system of Sperry in the use of its foreign patents somehow relate to the use of its domestic patents, which results in such a misuse of those patents that they cannot be enforced. No pertinent authorities are cited in support of this alleged principle. Neither is there any reference to it in the Statement of Facts in the defendants' brief.
 
 
 117
 Counsel for the defendants approach this phase of the case in their brief as though this Court was hearing and determining the questions raised de novo. We address our attention only to alleged errors of the trial court.
 
 
 118
 Foreign patents grant no monopolies in the United States, nor do United States patents grant any monopolies in foreign countries. A patent is granted by a sovereign power and its rights, privileges and obligations begin and end with the country that issues it.
 
 
 119
 The trial judge found that there was no misuse of the patents in suit as a result of Sperry's licensing and cross-licensing of foreign patents. There is ample evidence to support this finding and it is not clearly erroneous. We agree with the finding and the law as applied to it by the trial judge,
 
 
 120
 Another claim of the defendants is that Sperry imposed a 'tying' agreement upon Electro Circuits, and that this agreement is illegal and constitutes a misuse of the Sperry patents and it is a violation of the anti-trust laws. In this connection, the trial court made findings, as follows: 'Electro Circuits was organized in California in 1951. It commenced active operations in that state in July 1951. Its first development was a weld inspection apparatus which was followed by the development of a Wide Band Converter and the Immerscope. These devices operate on the principle of the pulse echo method of ultrasonic testing. At the time of its first development Electro Circuits attempted to secure a license under the Sperry patents in return for its agreement to purchase from Sperry unpatented sub-assemblies of the latter's patented devices. Sperry rejected this proposal. When Electro Circuits was ready to market its Wide Band Converter, Richards, the president of that company, had a conference with the officials of Sperry with a view of securing an agreement that would permit Electro Circuits to manufacture and sell its Wide Band Converter without being sued for infringement. * * * It was agreed between the parties, however, that Sperry would forbear instituting suit for infringement provided Electro Circuits sold its Wide Band Converter for use only in conjunction with Sperry's Reflectoscopes. The Wide Band Converter was designed so that it could be 'plugged in' to a Reflectoscope. Under this arrangement of joint use, only the display portion of the cathode ray oscilloscope of Sperry's instrument was used. All other functions of the dual apparatus were performed by the Wide Band Converter. The agreement remained in effect for about 9 months, during which time Electro Circuits sold 8 Wide Band Converters to owners of Reflectoscopes and one Wide Band Converter to a customer who agreed to its use with a Reflectoscope to be purchased from Sperry.'
 
 
 121
 This agreement does not provide for the sale of any article covered by the patents in suit. Obviously then it does not provide that some other article either patented or unpatented must be purchased in order to get an article covered by the patents in suit. The agreement permits Electro Circuits to market its Wide Band Converter without being subjected to a suit for infringement. At this point, the parties to the agreement assumed that the Wide Band Converter infringed the Sperry patents. This being so, Sperry could have prevented the sale of the converters or could have sued the users for infringement. Sperry was legally entitled to be free of competition in the use of its patents. Under the agreement, no trade was unlawfully restrained. An article was thus introduced into commerce that might otherwise have been withheld from the markets.
 
 
 122
 There is no tying agreement here as that term has been defined by the courts.
 
 
 123
 'For our purposes a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed.' Northern Pac. R. Co. v. United, States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545.
 
 
 124
 The evil of tying agreements is the suppressing of competition. 'Tying agreements by which the sale of one commodity is conditioned on the purchase of another have been repeatedly condemned under the antitrust laws, since they serve no purpose beyond the suppression of competition.' Black v. Magnolia Liquor Co., 355 U.S. 24, 25, 78 S.Ct. 106, 108, 2 L.Ed.2d 5.
 
 
 125
 To be free of competition on the article patented is the very basis of the grant of a patent. In the agreement Sperry did no more than protect its fundamental and basic rights under its patents.
 
 
 126
 We conclude that the trial judge was not in error in finding that the agreement in question was neither a violation of the anti-trust laws nor a misuse of the patents in suit.
 
 
 127
 Another question presented by the defendants in their briefs concerns an alleged imposition by Sperry of restrictions on the use of its patented Reflectoscope after sale or lease. The argument addressed to this question relates to an Angle Beam Search Unit not covered by any of the patents in suit.
 
 
 128
 The evidence discloses that the Reflectoscope which is the subject of the patents in suit was sold outright without restriction. Approximately eleven hundred were so sold.
 
 
 129
 The Angle Beam Search Unit might be termed an accessory to the Reflectoscope, a device that might be used with it but not essential to the use of the Reflectoscope.
 
 
 130
 Until January 16, 1956 this device was leased and not sold. A condition of the lease was as follows: '1. Use. To be used for inspecting lessee's manufactured products, materials used therein, production equipment, and in the case of railroads, for the inspection of its rolling stock and components pertaining thereto.' (dx RRRR, 1403a.) As of the above date all units were sold outright without restrictions.
 
 
 131
 There is no reference to any evidence, nor do we find any that would indicate that the patents in suit were in any way used to enforce restrictions on the use of the Angle Beam Search Units.
 
 
 132
 The patents in suit, therefore, were not misused or used in violation of the anti-trust laws. It is unnecessary to pursue further the restrictive condition of the lease of the Angle Beam Units. We are in accord with the conclusion reached by the trial judge.
 
 
 133
 We find no merit in the claim of defendants that the patents in suit were misused by placing on the patent tag of Reflectoscopes other patent numbers in addition to those in suit, under the words 'Manufactured under one or more of the following patents.'
 
 
 134
 The evidence does not show that the defendants or anyone else was injured by this listing of patents. It does not disclose that Sperry acquired by monopoly beyond what it was entitled to have under its patents. The patents in suit were properly listed on the patent tag.
 
 
 135
 The findings and conclusions of the trial judge on this question were correct.
 
 
 136
 The trial judge found that the defendants failed to sustain their claims of misuse and violation of the anti-trust laws. We have sustained him in these findings. It follows therefore that he was correct in dismissing the counterclaim of the defendant Electro Circuits, Inc.
 
 
 137
 The judgment of the District Court will be affirmed, except as to its judgment finding claims numbered 16, 19, 20, 25, 26, 29 and 32 of patent No. 2 valid and infringed.
 
 
 138
 The judgment of the District Court as to claims numbered 16, 19, 20, 25, 26, 29 and 32 of patent No. 2 is reversed. The case is remanded to the District Court with instructions to enter a judgment on the above numbered claims of patent No. 2 in accordance with this opinion.